# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAWANZAH CROCKETT, | |
| *Plaintiff*, | |
| v. | Civil Action No. 16-1357 (RDM) |
| DISTRICT OF COLUMBIA, *et al.*, | |
| *Defendants*. | |

## MEMORANDUM OPINION

Plaintiff Jawanzah Crockett, proceeding *pro se*, filed suit against the District of Columbia and nine employees of D.C. Public Schools ("DCPS") alleging that they violated his rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401.01 *et seq.*, the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, the D.C. Student Grievance Procedures, 5-B DCMR § 2405, and the D.C. common law in connection with his education at Wilson High School from September 2011 to June 2015. *See* Dkt. 1. The Court previously dismissed Crockett's claim against Defendants under the IDEA on grounds of issue preclusion. Dkt. 17 at 18. Defendants now move for summary judgment with respect to Crockett's ten remaining claims. Dkt. 26. In addition, Daniel Shea, the Instructional Superintendent of DCPS, separately moves to dismiss Plaintiff's claims against him for failure to state a claim. *Id.* at 15–16.

For the reasons explained in this memorandum opinion, the Court will **GRANT** Defendant Shea's motion to dismiss and will **GRANT** the remaining Defendants' motion for summary judgment.

## I. BACKGROUND

### A. Factual Background

The record before the Court is unusually thin, consisting mostly of Plaintiff's deposition at which he could not remember the answers to many questions and at which he promised to provide further discovery, but later failed to do so. *See* Dkt. 26. To provide context, the Court will set forth the allegations in Plaintiff's complaint but, when ultimately considering Defendants' motion for summary judgment, will give weight to only those allegations that are supported by *some* evidence.

Crockett began attending Wilson High School ("Wilson H.S.") in the fall of 2011. Dkt. 1 at 3 (Compl. ¶ 15). He struggled during that first year, and his mother sought testing to determine whether he might be eligible for special education services. *Id*. (Compl. ¶¶ 15–16). An accommodations plan drafted under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, led to his improved performance in his sophomore year. *Id*. (Compl. ¶ 16). Still, miscommunications and disagreements about the plan hampered its implementation, and Crockett's mother continued to push for further evaluation of her son. *Id*. (Compl. ¶¶ 17–24). Eventually, the DCPS conceded that Crockett was entitled to an Individualized Education Plan ("IEP") under the IDEA. *Id*. (Compl. ¶¶ 21–22). On April 7, 2014, during the spring of Crockett's junior year, Wilson H.S. finally issued the IEP, *id*. (Compl. ¶ 22).

Before challenging the school's compliance with the IEP, Crockett's mother filed a due process complaint with the D.C. Office of the State Superintendent of Education ("OSSE"), challenging the DCPS's failure to offer Crockett an IEP earlier in his tenure at Wilson H.S. *See* Dkt. 12-8 (First OSSE Hearing Report). The OSSE hearing officer concluded in December 2014 that the DCPS had failed to provide Crockett a "free appropriate public education"—or a

"FAPE"—from October 11, 2012, to April 7, 2014.  *Id*. at 3, 8–10.  As compensatory education, the OSSE hearing officer ordered the DCPS to provide Crockett 200 hours of independent tutoring, 20 hours of behavior counseling, and reimbursement for prior tutoring expenses.  *Id*. at 10.  Crockett has not challenged the DCPS's compliance with that award.

During the 2014–2015 school year, Crockett was initially placed into a self-contained classroom (one containing only students receiving special education services) for math, as contemplated by his IEP.  Dkt. 12-7 at 5 (Second OSSE Hearing Report).  Because he was substantially more advanced than other students in the self-contained classroom, Crockett's special education teacher recommended that he be returned to the general education classroom for math.  *Id*.  At his mother's request, that switch was made.  *Id*.  Crockett passed both math classes he took his senior year.  *Id*.

By contrast, Crockett struggled in Spanish.  Despite his mother's repeated efforts to coordinate with his teachers to ensure that his assignments were turned in, he ultimately failed that class.  *Id*.  Crockett alleges that this failing grade was the product of a host of missteps by Defendants, including their declining to provide adequate support and accommodations, "denying [his] parent access to teachers in order to assist in organizing . . . and keeping track of [his] assignments," Dkt. 1 at 13 (Compl. ¶ 87), "add[ing] more work," failing to count completed work toward his grade, "lowering his grade due to late submission" of work, *id.* at 18 (Compl. ¶ 115); and falsifying attendance records, *id*. at 17–18 (Compl. ¶¶ 112, 118–25).  Because he failed Spanish, Crockett was not permitted to graduate with his class and was required to repeat the course over the summer.  Dkt. 12-7 at 5.

After receiving notice of his failing grade in Spanish, Crockett took two actions.  First, he lodged another due process complaint with the OSSE.  *See* Dkt. 12-7.  The complaint alleged (1)

that his mother was not timely provided with his most recent IEP and (2) that the school's decision to return him to the math general education classroom at his mother's request had not relieved the school of its obligation to provide him with additional educational services in math. *See id*. at 3.   Although those claims had nothing to do with his Spanish grade, Crockett sought compensatory education in the form of Spanish tutoring, funding for the Spanish summer school course he was taking to graduate, and enrollment in a college preparatory course. *Id*. at 9.   A due process hearing was held on July 23, 2015. *Id*. at 2.   On August 7, 2015, the OSSE hearing officer rejected Crockett's first claim but concluded that Wilson H.S.'s failure to provide Crockett with the additional math support contemplated by his IEP violated the IDEA. *Id*. at 6– 8.   The hearing officer declined to direct the Wilson H.S. provide the relief that Crockett proposed because it did not "correlate[]" with that omission and, instead, ordered that Crockett receive "20 hours of independent behavior counseling." *Id*. at 9–10.

Second, Crockett brought suit against the DCPS, Wilson H.S., and various school administrators and teachers in D.C. Superior Court, seeking a temporary restraining order and preliminary injunction to compel Wilson H.S. to allow him to "pick up [his] cap and gown, participate in graduation rehearsal[,] and graduate on June 13 with [his] class." Dkt. 12-2 at 1 (Superior Court Compl.).   Crockett's complaint did not identify a particular cause of action, but it did allege that the defendants in that action had failed to provide him with "accommodations" and had failed to act in a timely manner on "grade disputes" that he had raised. *Id*.   The Superior Court Complaint sought to permit him to graduate with his class and thus left little doubt that Crockett's allegations were focused, in large part, on his failing grade in Spanish. *Id.*   The Superior Court denied both Crockett's motion for a temporary restraining order and his motion for a preliminary injunction. Dkt. 12-3.   The court ultimately construed Crockett's complaint to

assert a claim under the IDEA and dismissed the action for failure to exhaust administrative remedies, as required by the IDEA. Dkt. 12-5 at 5–6. Crockett appealed that decision, but the D.C. Court of Appeals dismissed his appeal as moot because the injunctive relief he sought—an order permitting him to participate in the graduation ceremony—could no longer be granted because the ceremony had already occurred. Dkt. 13-1 at 1–2.

## B.    Procedural Background

On June 28, 2016, Crockett filed the present action. Dkt. 1. Five of the defendants in this case were also named in the earlier suit: the DCPS, Wilson H.S.'s assistant principal for special education, the school's acting principal, Crockett's Spanish teacher, and his special education case manager. *Compare* Dkt. 12-1 at 1, *with* Dkt. 1 at 2–3. To this list, the present suit adds six new defendants: the DCPS "Instructional Superintendent managing Cluster VIII schools," a second Spanish instructor at Wilson H.S., Wilson H.S.'s "assistant principal for 2015 summer school and attendance supervisor," an attendance counselor at Wilson H.S., an AP English teacher at the school, and the Mayor of the District of Columbia. Dkt. 1 at 1–3. Unlike his prior suit, which sought only injunctive relief, this action seeks only damages. Dkt. 1 at 21–22.

Defendants moved for summary judgment or, in the alternative, to dismiss certain of the counts in the complaint, including Count II, which was brought under the IDEA. *See* Dkt. 12. The Court granted that motion with respect to Count II, holding that Crockett's Superior Court suit had preclusive effect with respect to whether Crockett had exhausted his administrative remedies as a prerequisite to bringing an IDEA action. *See* Dkt. 17. The Court also dismissed Crockett's claims against the Mayor on the ground that she is a not a proper defendant and, in any event, Crockett had explained that he was only attempting to serve the Mayor's office in

compliance with D.C. Rules of Civil Procedure, *id.* at 7 n.2, and ordered that the District of

Columbia be substituted for the DCPS on the ground that subordinate agencies within the D.C.

government are not generally subject to suit, *id.* at 20–21.  The Court denied the Defendants'

motion in all other respects.  *Id.* at 21.

Having now completed discovery, Defendants move for summary judgment on all ten

remaining counts and move to dismiss all claims against Daniel Shea for failure to state a claim.

Dkt. 26.

## II.  LEGAL STANDARD

Summary judgment is available "if the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*,

433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the

outcome of the litigation.  *Holcomb*, 433 F.3d at 895; *Liberty Lobby*, 477 U.S. at 248.  A dispute

is "genuine" if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248;

*Holcomb*, 433 F.3d at 895.  "A party asserting that a fact cannot be or is genuinely disputed must

support the assertion by . . . citing to particular parts of materials in the record . . . ."  Fed. R. Civ.

P. 56(c)(1)(A).

The party seeking summary judgment "bears the heavy burden of establishing that the

merits of his case are so clear that expedited action is justified."  *See Taxpayers Watchdog, Inc.*

*v. Stanley*, 819 F.2d 294, 297 (D.C. Cir. 1987).  When a motion for summary judgment is under

consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences

are to be drawn in his favor."  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Potomac Elec.*

*Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006). The non-movant's assertion that a genuine dispute of fact precludes summary judgment must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant must provide evidence that would permit a reasonable jury to find in its favor. *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987). If its evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50.

In contrast, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although "'detailed factual allegations'" are not required, the complaint must contain "more than an unadorned, the-defendant-unlawfully-harmed-me allegation." *Id.* (quoting *Twombly*, 550 U.S. at 555).

### III. ANALYSIS

Crockett asserts a broad array of claims, and Defendants raise an equally broad array of responses. Some of those responses go to the legal validity of Crockett's claims, while others rely on Crockett's failure to offer any competent evidence of his mistreatment.[1] The Court will consider each set of claims in turn.

---

[1] Defendants seek to strike large portions of the evidence that Crockett attaches to his opposition brief on the ground that he failed to produce those materials in discovery, despite many requests

## A.    FERPA

Defendants move for summary judgment with respect to Count IV, which alleges that Defendants violated Crockett's rights under FERPA, 20 U.S.C. § 1232g, by denying him "access to [his] education records, including attendance or the right to seek to have the records amended [or] corrected" and by "improperly disclos[ing] personally identifiable information derived from [Plaintiff's] education records." Dkt. 1 at 16 (Compl. ¶¶ 105–06). In relevant part, FERPA conditions an educational institution's receipt of federal funds on the institution: (1) providing parents the opportunity to "inspect or review the education records of the their children" who have attended that institution, 20 U.S.C. § 1232g(a)(1)(A) ("right-of-access provision"); (2) providing parents the "opportunity for a hearing by" the school "to challenge the content of such student's education records, in order to ensure that the records are not inaccurate" and to correct them accordingly, *id.* § 1232g(a)(2) ("right-to-challenge provision"); (3) not "permitting the release of education records . . . of students without the written consent of their parents" except to certain specified individuals and agencies, *id.* § 1232g(b)(1) ("nondisclosure provision").

Defendants contend that Crockett has failed to proffer any evidence to support his claim that DCPS failed to comply with any of these provisions. Dkt. 26 at 25–26. The Court need not reach that question, however, because FERPA does not create a damages remedy. Although there was a time when courts recognized implied rights of action with greater ease, it is now well-established that "a plaintiff suing under an implied right of action . . . must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Alexander v. Sandoval*, 532 U.S. 275, 286

---

from Defendants and many promises by Crockett to do so. *See* Dkt. 32 at 2–8. Because nothing in those materials creates a genuine dispute of material fact, the Court need not decide whether Defendants' motion to strike is well-founded, and the Court, instead, denies the motion as moot.

(2001)).  For that reason, the Supreme Court has held that "there is no question that FERPA's nondisclosure provisions fail to confer enforceable rights."  *Id.* at 287.  That same reasoning applies to each of the FERPA restrictions on federal funding that Plaintiff invokes.

The Court will, accordingly, dismiss Plaintiff's FERPA claim (Count IV) for lack of a damages remedy.

**B.      5-B DCMR § 2405**

Defendants move for summary judgment on Crockett's claim (Count III) for failure to comply with 5-B DCMR § 2405, which establishes the regulatory procedures by which student grievances are heard by administrators of D.C. public schools.  Like their challenge to Crockett's FERPA claim, Defendants argue that 5-B DCMR § 2405 does not create a private right of action for damages.  Dkt. 26 at 23–24.  To determine whether a D.C. statute or regulation creates a private right of action, the Court must consider whether (1) the plaintiff is "one of the class for whose *especial* benefit the statute was enacted;" (2) whether there is "any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one;" and (3) whether it is "consistent with the underlying purposes of the legislative scheme to imply such a remedy for plaintiff."  *Coates v. Elzie*, 768 A.2d 997, 1001 (D.C. 2001) (quoting *In re D.G.*, 583 A.2d 160, 166 (D.C. 1990) (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975))).  The "ultimate issue" however, is always "whether the legislature intended to create a particular cause of action, because 'unless such legislative intent can be inferred from the language of the statute, the statutory structure or some other source, the essential predicate for implication of a private remedy simply does not exist.'"  *Id.* (quoting *Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 532–33 (1989)).

Although the 5-B DCMR § 2405 does not expressly identify the statutory authority upon which it rests, the Mayor possesses general authority to "promulgate rules and regulations governing DCPS," *see* D.C. Code § 38-172(c)(1). That statutory provision, however, merely authorizes the Mayor to promulgate regulations "governing DCPS," *id.*; it says nothing about the rights of third parties, much less about a right to recover damages from the District for failure to comply with the Mayor's regulations concerning "curricula, operations, functions, budget, personnel, labor negotiations and collective bargaining agreements, facilities, and other education-related matters," *id.* § 38-172(a). There is thus no suggestion in the statute that, through such regulations, the Mayor could create new private causes of action for damages. *See id.*

Even accepting what the D.C. Court of Appeals has called the "dubious proposition" that school regulations could create what amounts to a new tort suit for damages, *see Brantley v. District of Columbia*, 640 A.2d 181, 184 (D.C. 1994), the regulations here do not do so. These regulations create a set of procedures allowing students and their parents to challenge DCPS officials' decisions and to seek to redress for unlawful discrimination and harassment. In *Coates v. Elzie*, the D.C. Court of Appeals held that similar regulations, which "establish[ed] a comprehensive system for notice, hearing, resolution, and administrative review of recommendations for disciplinary segregation," did not create a private cause of action. 768 A.2d at 1002. Indeed, the court explained, the fact that those regulations—like the ones at issue here—"allow[ed] for administrative appeal . . . tend[ed] to 'support the opposite conclusion that no right to enforcement by civil action for damages exists.'" *Id.* (quoting *Brantley*, 640 A.2d at 184). The *Coates* decision is controlling here.

The Court will, accordingly, dismiss Plaintiff's 5-B DCMR § 2405 claim (Count III) for lack of the damages remedy sought.

**D.     Common Law Tort Claims**

1.     *Claims Against the District of Columbia*

Defendants move for summary judgment with respect to Crockett's claims under D.C. tort law (Counts V through X) on the ground that he failed to provide the required pre-suit notice.[2] *See* Dkt. 26 at 13–15.  Under D.C. law, a plaintiff seeking to bring a suit "against the District of Columbia for unliquidated damages to person or property" must first "give notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause and circumstances of the injury or damage."  D.C. Code § 12-309.  That notice must be provided "within six months after the injury or damage was sustained."  *Id.*

According to Defendants, Crockett did not provide the required notice.  *See* Dkt. 26 at 13–15.  For support, they proffer a declaration from Peter Clark, the Tort Liability Program Administrator and Senior Supervisory Attorney with the Tort Liability Division of the District of Columbia Office of Risk Management, the portion of the D.C. government that "receives, processes and investigates potential claims against the District of Columba pursuant to" § 12-309.  Dkt. 26-7 at 1 (Clark Decl. ¶ 1).  He attests that his search of that office's records revealed that it had not received a notice from Crockett related to any of the claims or defendants listed in his complaint.  *Id.* at 1–2 (Clark Decl. ¶ 4).

---

[2]  Defendants also move for summary judgment with respect to Crockett's DCHRA claim (Count XI) on this ground.  But, D.C. Code 12-309, on which Defendants base their motion, contains an exception for claims brought under the DCHRA.  *See* D.C. Code § 12-309(b) ("This section shall not apply to claims brought under § 2-1403.16 . . . ."); *id.* § 2-1403.16 (providing a private cause of action under the DCHRA).

Although the Defendants contend this ends the matter as to all of the Defendants, the Court must address two wrinkles before it can agree. The first wrinkle concerns how notice must be provided and whether it matters that the District and the individual defendants may have had actual notice of the "time, place, cause, and circumstances of [Plaintiff's] injury or damage," D.C. Code § 12-309, as a result of the lawsuit Crockett filed in Superior Court seeking an injunction permitting him to graduate with his class, *see* Dkt. 12-2. The Court is unaware of any case law addressing whether the *prior* filing of a *different* lawsuit based on the same conduct satisfies D.C. § 12-309—and neither party points to any such authority.

The D.C. Court of Appeals has, however, considered whether and when actual notice might provide an alternative to the written notice contemplated by § 12-309. In *Campbell v. District of Columbia*, 568 A.2d 1076 (D.C. 1990), the court rejected a Fire Department report—a document the plaintiffs contended provided actual notice—as a substitute for the requirements of § 12-309. In reaching that result, the court pointed to the exception to formal notice contained in the statute itself: "[A] report in writing by the Metropolitan Police Department, in regular course of duty[.]" *Id.* at 1078. That, it explained, was the full extent of any exception to § 12-309's written notice requirement in cases of actual notice. *See id.*; *see also Jenkins v. District of Columbia*, 379 A.2d 1177, 1178 (D.C. 1977) (holding that reports of the U.S. Attorney's Office and criminal trial proceedings did not satisfy § 12-309's requirements). If the exception for actual notice does not extend from police department reports to fire department reports, it does not reach a previously filed lawsuit—particularly one that did not even seek damages.

The second wrinkle concerns whether only claims against the District are subject to this notice requirement or whether the requirement applies, as well, to claims against employees of the District. The answer to that question depends on whether the employee is sued in her official

or individual capacity. Starting with the plain language of § 12-309, the notice requirement applies to actions "maintained against the District of Columbia." D.C. Code § 12-309. Because suits brought against "defendants in their official capacities [are] treated as suit[s] against the District of Columbia," *Arnold v. Moore*, 980 F. Supp. 28, 36 (D.D.C. 1997); *see also Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (suits brought against employees in their official capacity "represent only another way of pleading an action against an entity of which an officer is an agent"), that language covers D.C. employees sued in their official capacities, *see, e.g.*, *Crafton v. District of Columbia*, 132 F. Supp. 3d 1, 10 n.8 (D.D.C. 2015); *Cox v. District of Columbia*, No. 91-2004, 1991 WL 258173, at *3 (D.D.C. Nov. 22, 1991). But it does not reach D.C. employees sued in their individual capacities. *Cf. Lewis v. Clarke*, 137 S. Ct. 1285, 1291 (2017) ("[S]overeign immunity 'does not erect a barrier to suits to impose individual and personal liability.'" (quoting *Hafer v. Melo*, 502 U.S. 21, 31 (1991)). Section 12-309 operates as a "condition precedent" to the District's waiver of sovereign immunity. *See Tucci v. District of Columbia*, 956 A.2d 684, 695 (D.C. 2008). Employees of a sovereign, however, are not themselves entitled to that immunity when sued in their individual capacities. *See Clark v. Library of Congress*, 750 F.2d 89, 103 (D.C. Cir. 1984) ("If a plaintiff seeks to recover damages from a defendant in his personal, individual capacity then there is no sovereign immunity bar."); *see also Morton v. U.S. Parole Comm'n*, 318 F. Supp. 3d 40, 48 (D.D.C. 2018) ("To the extent [plaintiff] . . . sues federal officials for money damages in their personal capacities . . . sovereign immunity is no bar to his claim."). As a result, neither the plain language nor the purpose of § 12-309 applies to D.C. employees sued in their individual capacities.

Because Crockett did not file the notice required by § 12-309, the Court will grant summary judgment in favor of the District and against the D.C. employees sued in their official (but not their individual) capacities on Crockett's common law tort claims (Counts V through X).

2. *Individual Capacity Claims*

It is unclear from Crockett's complaint whether he intends to sue any of the D.C. employees in the individual (and not simply official) capacities. Because he is proceeding *pro se*, however, the Court will liberally construe the complaint, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), and will assume that he intends to bring both official and individual capacity claims.

Even with the benefit of the doubt, one of these defendants, Daniel Shea, argues that Crockett's claims against him must be dismissed for failure to state a claim. Dkt. 26 at 15–16. As Shea correctly observes, Crockett's complaint mentions Shea only twice. On one occasion, the complaint merely lists Shea as one of the defendants in the D.C. Superior Court action. Dkt. 1 at 5 (Compl. ¶ 28), and, on the other occasion, the complaint alleges that Crockett filed the Superior Court suit "after receiving notice of failing Spanish . . . and after [being] given extended to time turn[] in all work required under the watchful eyes of Instructional Superintendent Daniel Shea and Fareeda Gayle, case manager," *id.* at 11 (Compl. ¶ 67). Those allegations, even if accepted as true, do not state any discernible, individual capacity claim upon which relief can be granted.[3] *See Iqbal*, 556 U.S. at 677. The Court will, accordingly, dismiss Crockett's claims against Shea. Were the Court to reach the merits of those claims on summary judgment, moreover, the result would be the same for the reasons discussed below.

---

[3] Even if the Court were to treat Crockett's brief in opposition as a motion to amend his complaint, the Court would reach the same conclusion. Crockett's assertion that Shea "personally manage[d] [Crockett's] final assignments' submission, final test submission and grading process at the end of the year that resulted in [his] failure," Dkt. 30 at 3, does not state a claim.

With respect to Crockett's remaining individual capacity claims, the Court will proceed claim by claim.

      a.     <u>IIEE Claim</u>

Crockett fails to state an intentional infliction of emotional distress ("IIED") claim (Count V) against the individual defendants. The three elements for an IIED claim under D.C. law are: "(1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *Kotsch v. District of Columbia*, 924 A.2d 1040, 1045 (D.C. 2007) (citing *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980); Restatement (Second) of Torts § 46 (1965)). The first element requires "conduct . . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* at 1045–46 (quoting Restatement (Second) of Torts § 46, cmt. d). The second element may be inferred "from the very outrageousness of a defendant's conduct." *Id.* (citing *Waldon*, 415 A.2d at 1077). The third element requires the outrageous conduct to "proximately cause the plaintiff emotional distress of so acute a nature that harmful physical consequences might not be unlikely to result." *Id.* at 1046 (internal quotations and citations omitted).

Defendants argue that they are entitled to summary judgment because Crockett has failed to proffer evidence that would permit a reasonable jury to find (1) that any conduct by any employee of the DCPS was so "extreme" or "outrageous" to be actionable or (2) that Crockett's emotional distress, if any, was sufficiently "severe." *See* Dkt. 26 at 26–30. Even crediting Crockett's allegations, the Court doubts that any of the alleged misconduct was sufficiently "extreme" or "outrageous" to support an IIED claim. The Court need not reach that question, however, because Crockett's IIED claim plainly fails on the second score.

Defendants have met their burden for purposes of summary judgment by showing that Crockett lacks any evidence that he suffered the kind of "severe emotional distress" necessary to support an IIED claim, shifting the burden to Crockett to offer evidence sufficient to give rise to a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(c). Under D.C. law, "severe emotional distress" must be not only "severe" but also "serious and verifiable." *Williams v. Baker*, 572 A.2d 1062, 1068 (D.C. 1990) (quoting *Bovsun v. Sanperi*, 461 N.E.2d 843, 849 (N.Y. 1984)). "'[M]ental anguish' and 'stress' [do] not rise to the level of the 'severe emotional stress' required by the case law." *Futrell v. Dep't of Labor Fed. Credit Union*¸ 816 A.2d 793, 808 (D.C. 2003) (finding the distress caused by demotion and termination to be insufficient to state a claim under D.C. law). At his deposition, Crockett characterized the distress he has allegedly suffered as being "pissed . . . off" that he was not allowed to "graduat[e] and [to] walk[] across the stage with [his friends]." Dkt. 33-1 at 48 (Crockett Dep. Tr. 48:11–13). He also testified that the experience of having his teachers and certain DCPS administrators laugh at him when the superior court judge denied his application for a TRO caused him "some distress." *Id.* at 50 (Crockett Dep. Tr. 50:1–3). But Crockett also testified that he never saw a doctor, never took any medication, and never sought counseling relating to his distress. *Id.* (Crockett Dep. Tr. 50:1–13). Nor has he identified any other concrete measure or indicia of the distress that he himself merely quantifies as "some."

The Court does not doubt that Crockett was genuinely upset and deeply disappointed because he was not permitted to participate in the graduation ceremony with the other members of his class and because, in his view, his teachers laughed at him when his first lawsuit failed. That type of frustration and dismay, however, does not rise to the level of "severe emotional distress" required to pursue an IIED claim under D.C. law. *Futrell*, 816 A.2d at 808.

The Court will, accordingly, grant summary judgment in favor of the individual defendants on Crockett's IIED claim (Count V).

### b. Forgery Fraud Claim

The individual defendants also move for summary judgment on Crockett's claim (Count VI) that they "defrauded" him by producing false attendance records in order fail him in his senior-year Spanish class. Dkt. 1 at 17 (Compl. ¶ 117–25). Common law fraud, under D.C. law, has five elements: "(1) a false representation (2) in reference to material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) action is taken in reliance upon the representation." *Bennett v. Kiggins*, 377 A.2d 57, 59 (D.C. 1977). To succeed on a fraud claim, Plaintiff must establish these elements "by clear and convincing evidence, which is not equally consistent with either honesty or deceit." *Id.*

Defendants argue that Crockett has failed to identify any evidence that they made a material false statement with knowledge of its falsity or that Crockett took any action in reliance on such a statement. Dkt. 26 at 31. For present purposes, Court need not delve into the DCPS attendance records because Crockett has failed to proffer any evidence that he relied on those allegedly false records. Crocket appears to argue that he relied on the attendance records because he did not graduate on time. This misunderstands the nature of reliance. Reliance requires (1) that the plaintiff have made a decision and (2) that he "justifiably relied on the truth of the matter asserted" as a "substantial factor" in making that decision. *Virginia Acad. of Clinical Psychologists v. Grp. Hosp. & Med. Servs., Inc.*, 878 A.2d 1226, 1238 (D.C. 2005) (quoting Restatement (Second) of Torts § 546). Here, however, Crockett does not suggest that he *decided* not to participate in the graduation ceremony or that he made any other decision or took any other action in justifiable reliance on the allegedly false records. Rather, Crockett knew

when he attended—and when he did not attend—class, and it was the DCPS that decided that he was ineligible to graduate with his class.

The Court will, accordingly, grant summary judgment in favor of the individual defendants on Crockett's "forgery fraud" claim (Count VI).

      c.   <u>Defamation Claim</u>

Crockett's defamation claim (Count VII) against the individual defendants fares no better. That claim alleges that Crockett was "defamed" when school officials inaccurately reported his attendance "on his report card, to the Office of the State Superintendent, to the Metropolitan Police, to attorneys, and to any agency requesting [his] attendance." Dkt. 1 at 18 (Compl. ¶ 127). Defendants move for summary judgment on multiple grounds.

Defendants first argue that "courts have outright rejected defamation claims based on mere academic disputes," and they urge the Court to follow suit. Dkt. 26 at 31–32. Neither of the cases to which Defendants cite, however, supports their argument. *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 89 (1978), did not contain a defamation claim at all—let alone one under D.C. law. It was instead a due process challenge to a medical school's dismissal of the plaintiff. Defendants contend that the decision, however, stands for the more general proposition that evaluations by teachers about the competency of their students are inherently subjective and thus should only rarely be second-guessed by the courts. *See* Dkt. 26 at 31–32. But even that general proposition is inapt here because Crockett's claim does not turn on a subjective assessment of his performance; rather, it turns on the objective question whether he was present in class when his teacher claimed he was not.

 The second case, *Kraft v. William Alanson White Psychiatric Foundation*, 498 A.2d 1145 (D.C. 1985), is more on the mark but still unavailing. There, the plaintiff had "enrolled in a

post-graduate continuing education program" and, upon finishing the program, was denied a certificate of completion because his professors found his clinical work was not satisfactory. *Id.* at 1146–47. The D.C. Court of Appeals held that the plaintiff could not maintain a defamation action against the school or its professors based on their evaluations of him because, by enrolling in the program, he had impliedly consented to the publication of such evaluations. An absolute privilege applied because "(1) there was implied consent; (2) the statements of which [the plaintiff] complains were relevant to the purpose that was the object of his consent; and (3) broadcast was limited to those with a legitimate interest in the subject matter." *Id.* at 1150. Here, however, Crockett did not impliedly consent. He did not voluntarily enroll in high school; he was required to attend. Thus, the absolute privilege outlined in *Kraft* does not apply.

Second, Defendants argue that Crockett's defamation claim is untimely because it was filed after the expiration of the one-year statute of limitations. Dkt. 26 at 34 (citing D.C. Code § 12-301). When exercising supplemental jurisdiction over a D.C. law claim, the Court looks to D.C. law to determine whether the statute of limitations has run. *See Gaudreau v. Am. Promotional Events, Inc.*, 511 F. Supp. 152, 157 (D.D.C. 2007); *see also A.I. Trade Fin., Inc. v. Petra Int'l. Banking Corp.*, 62 F.3d 1454, 1458 (D.C. Cir. 1995). The statute of limitations for a defamation claim under D.C. law runs from the date of publication of the allegedly defamatory statement. *Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP*, 715 A.2d 873, 882 (D.C. 1998).

Although Crockett does not identify the date on which the alleged defamation occurred, Defendants contend that it must have happened on or before June 11, 2015, the date Crockett was supposed to graduate from high school. Dkt. 26 at 34. Defendants argue that because Crockett's complaint was not filed until June 28, 2016, and because his application to proceed *in*

*forma pauperis* ("IFP") application was not received until June 13, 2016—a year and two days after the last possible date of publication—his claim is untimely. It is not entirely clear from the record when Crockett first delivered his complaint to the Clerk of Court. His application to proceed IFP shows that it was received in the mail room on June 14, 2016, but it also bears a date stamp for June 13, 2016 at 11:53 p.m. *See* Dkt. 2. His complaint, in turn, bears only the June 14, 2016 "Mail Room" stamp. Dkt. 1. Because the Court must resolve all disputed questions of fact in Plaintiff's favor for purposes of Defendant's motion for summary judgment, *Liberty Lobby*, 477 U.S. at 255, the Court will assume that the complaint and IFP application were both deposited with the Court at 11:53 p.m. on June 13, 2016. Even though the complaint was not docketed until June 28, 2016, after Crockett's IFP application was granted, a complaint is filed in this district when it is first delivered to the Clerk, even if the filing fee has not yet been paid or *in forma pauperis* status has not yet been granted. *Morrison v. Nielsen*, 325 F. Supp. 3d 62, 68 (D.D.C. 2018).

At first glance, pushing the filing date back to June 13, 2016 does little to help Crockett with Defendants' contention that the statute of limitations started to run no later than June 11, 2015. But, as it turns out, June 11, 2016 was a Saturday, which means that Plaintiff's complaint was received on the Monday after the period lapsed. *See* Calendar for Year 2016, Time and Date, https://www.timeanddate.com/calendar/?year=2016&country=1. Thus, the timeliness of Plaintiff's complaint turns on whether D.C.'s statute of limitations tolls time where a deadline falls on a weekend day.

The Courts of the District of Columbia do not appear to have spoken on this precise question. The D.C. Superior Court rules, however, provide that for purposes of "computing any time period specified . . . in any statute that does not specify a method of computing time," the

period "include[s] the last day of the period, but if the last day is a Saturday, Sunday, or a legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday or legal holiday." D.C. Super. Ct. R. Civ. P. 6(a)(1)(C). Because D.C. Code § 12-301 does not "specify a method of computing time," the Court concludes that the method provided in the Superior Court rules—which is the same as the one provided in the Federal Rules of Civil Procedure, *see* Fed. R. Civ. P. 6(a)(1)(C)—governs here. As a result, without further detail about when the alleged defamatory action occurred, the Court cannot grant summary judgment based on Defendants' statute of limitations defense.

Finally, and most briefly, Defendants contend that Crockett has failed to identify any "evidence supporting" his defamation claim. Dkt. 26 at 3. To state a claim for defamation under D.C. law, the Plaintiff must show "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Beeton v. District of Columbia*, 779 A.2d 918, 924 (D.C. 2001) (internal quotations omitted). When Plaintiff was asked at deposition to identify the evidence supporting his defamation claim, however, the following exchange occurred:

A.   In terms of the claim, the defamation claim I can get you all of your answers on March 20th for that.

Q.   Okay. How were you defamed?

A.   I can answer that on March 20th.

Q.   What harm was done to you because of this defamation?

A.   I can get back to you on March 20th about that one.

Q. What makes you think that your reputation was damaged?

A. Not graduating on time and the fact that your employers find out about it is not exactly something that you want to have happen. In a sense that my employers are aware of my issues at Wilson its kind of what I didn't want them to find. That's something they shouldn't really be able to find.

Q. Why would your employers know anything about your reputation at Wilson?

A. That is what I am curious about as well.

Q. I mean what information do you have that your employer knows anything about what happened at Wilson?

A. I made it one of the single most important things to only tell them I went to Wilson. And even during the hiring interview, the two that I did for the company even the most recent one I did not let them know of any issues at Wilson. I didn't let them know I knew people even that worked with me that I went to the same school. And didn't let them know anything about Wilson, what went on, my day to day life, my background at Wilson.

Q. But didn't you just say that your employer was aware of information about you at Wilson?

A. They just knew I went to Wilson.

Q. Okay.

A. They didn't know anything about what went on behind those walls.

Q. So if they didn't know anything about what went on at Wilson, how was your reputation damaged?

A. Because they found out some of the issues that were going on at Wilson.

Q. And how did they find out?

A. That is what I don't know.

Q. And after they found out what happened with your employment?

A. My boss did, you know, briefly treat me a little bit differently. But seeing as I'm hard working and very persistent he quickly found that the person had said is untrue.

Q. So what harm has been caused?

A. I guess you could say brief humiliation by [my] boss. But it's, that is over and done with and not going to happen again.

Dkt. 33-1 at 127–30 (Crockett Dep. Tr. 127:8–130:6).

Crockett did not provide any additional evidence supporting his defamation claim, on March 20 or otherwise. The colloquy reproduced above, accordingly, constitutes the entirety of Crockett's evidentiary support for his defamation claim, and it is not enough to clear the hurdle of summary judgment. Among other deficiencies, because the Court has already granted summary judgment for Defendants on Crockett's claim against the District and his official capacity claims, his defamation claim can survive summary judgment only if he can present some evidence that one or more of the defendants defamed him in their personal capacities. But Crockett candidly acknowledges that he himself remains "curious" about how his employer knew "anything about [his] reputation at Wilson." Dkt. 33-1 at 128 (Crockett Dep. Tr. 128:8–11); *see also* Dkt. 33-1 at 121 (Crockett Dep. Tr. 121:7–19). Absent some evidence that a specific, individual-capacity defendant "at least negligent[ly]" published "a false and defamatory statement" about him, *see Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 578 (D.C. Cir. 2013) (citing *Crowley v. N. Am. Telecomms. Ass'n*, 691 A.2d 1169, 1173 n.2 (D.C. 1997)), Crockett cannot possibly prevail on this claim.

The Court will, accordingly, grant the individual capacity defendants' motion for summary judgment with respect to Crockett's defamation claim (Count VII).

d. <u>Harassment Claim</u>

23

Defendants move to dismiss Crockett's harassment claim (Count VIII) on the ground that no such common law tort exists under D.C. law. *See* Dkt. 26 at 34–35. The Court agrees. Although it is true that harassment may constitute evidence of intentional infliction of emotional distress, *see, e.g.*, *Homan v. Goyal*, 711 A.2d 812, 820 (D.C. 1998), a claim of "'harassment' . . . do[es] not refer to any cause of action cognizable under District of Columbia common law," *Chandler v. James*, 783 F. Supp. 2d 33, 40–41 (D.D.C. 2011).

The Court will, accordingly, grant the individual capacity defendants' motion for summary judgment on Crocket's harassment claim (Count VIII).

e.  Negligence and Neglect of Duty Claims

Finally, Defendants contend that Crockett's "negligence" and "neglect of duty" claims (Count IX and X, respectively) amount to claims for educational malpractice, a tort that D.C. law does not recognize. Dkt. 26 at 35–36. Defendants are correct that the D.C. Court of Appeals has held that educational malpractice claims are not cognizable under D.C. common law. *See Brantley v. District of Columbia*, 640 A.2d 181, 184–85 (D.C. 1994); *see also id.* at 183 (collecting cases from other courts reaching the same result). The question, then, is whether Counts IX and X are properly treated as claims for educational malpractice. The D.C. Court of Appeals instructs courts to look to the "gravamen" of the complaint to assess whether such a claim is asserted, "regardless of the phrasing of [the Plaintiff's] pleadings." *Id.* at 183. In *Brantley*, the Plaintiff alleged a that the District had failed to comply "with applicable regulations relating to [the plaintiff's] assessment and placement," "fail[ed] to forward her academic records to her new school," and manipulated documents "to conceal noncompliance by DCPS with its legal obligations." *Id.* at 183. The plaintiff further alleged that, as a result of this

tortious conduct, she was not assigned to the right school and was thus "compelled to spend three years in the second grade." *Id.*

In his negligence claim (Count IX), Crockett alleges that the individual defendants failed to provide accurate attendance records in a timely manner, failed to provide accurate records of assignments turned in and the grading of assignments, and declined to correct those records when asked. Dkt. 1 at 19 (Compl. ¶¶ 138–40). He further alleges that this negligence required him to repeat courses and precluded him from graduating with his class. *Id.* at 19–20 (Compl. ¶¶ 140–42). Crockett's neglect of duty claim (Count X), in turn, includes allegations specific to particular individual defendants about how they failed to perform specific job functions as required. He alleges, for example, that one defendant, Fareeda Gayle, "neglected her duty as a case manager responsible for informing [him] of missing assignment[s]." *Id.* at 21 (Compl. ¶ 152). At bottom, both sets of allegations allege that Defendants' negligence caused Crockett the same kind of injury at issue in *Brantley*: the delay or denial of an education to which he was entitled. Thus, as in *Brantley*, his claim is fundamentally one for educational malpractice and thus is not cognizable under D.C. law.

The Court will, accordingly, grant the individual defendants' motion for summary judgment on Crockett's negligence claims (Counts IX and X).

## E. ADA and DCHRA Claims

Defendants also move for summary judgment on Crockett's ADA and DCHRA claims (Counts I and III). With respect to the ADA claim, they contend that Crockett has failed to identify any evidence that they discriminated against or retaliated against Crockett because of his disability or failed to provide him with statutorily mandated accommodations, and, with respect to his DCHRA claim, they contend that Crockett has taken a "kitchen sink" approach, "merely

str[inging] together a list of statutes with the words 'discrimination' and 'retaliation' thrown in for good measure." Dkt. 26 at 37. Although it is, admittedly, difficult to discern the precise contours of Crockett's argument, the Court will give him the benefit of the doubt and will treat his DCHRA claim as containing the same substantive allegations that undergird his ADA claim.

For present purposes, moreover, the governing legal standards also overlap. *Compare* 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity") *with* D.C. Code § 2-1402.41 ("It is an unlawful discriminatory practice . . . for an educational institution . . . [t]o deny, restrict, or to abridge or condition . . . access to . . . any of its . . . services, programs, or benefits of any program or activity to an person otherwise qualified, wholly or partially, for a discriminatory reason, based upon the actual or perceived . . . disability of any individual"). As the D.C. Court of Appeals has explained, "[b]ecause the DCHRA definition of 'disability' closely resembles the definition of disability found in the [ADA]," the D.C. courts "'have considered decisions construing the ADA as persuasive in [their] decisions construing the comparable sections of [the] DCHRA.'" *Chang v. Inst. For Pub.-Private P'ships, Inc.*, 846 A.2d 318, 324 (D.C. 2004) (quoting *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583–84 (D.C. 2001)). This Court, likewise, has applied "the standards applicable to claims brought under the ADA" in considering parallel claims brought under the DCHRA. *See Hodges v. District of Columbia*, 959 F. Supp. 2d 148, 153 (D.D.C. 2013). The Court will, accordingly, considers Crockett's ADA and DCHRA claims together and will apply the governing ADA standards.

1. *Disability Discrimination*

Crockett alleges that the District violated his rights under Title II of the ADA, Dkt. 1 at 13 (Compl. ¶ 78), which provides that "no qualified individual with a disability shall, by reasons of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subject to discrimination by any such entity," 42 U.S.C. § 12132. "The ADA is 'directly patterned on the Rehabilitation Act,' and the elements of an ADA Title II claim are nearly identical to the elements of a Rehabilitation Act section 504 claim." *Montgomery v. District of Columbia*, No. 18-1928, 2019 WL 3557369, at *7 (D.D.C. Aug. 5, 2019) (quoting *Adams v. Rice*, 531 F.3d 936, 948 (D.C. Cir. 2008)); *see also Am. Council of the Blind v. Paulson*, 525 F.3d 1256, 1260 n.2 (D.C. Cir. 2008) (explaining that Title II and section 504 claims are "similar in substance" and that therefore "cases interpreting either are applicable and interchangeable"). To prevail on a Title II claim, a plaintiff must show that "(1) he is a qualified individual with a disability, (2) a public entity excluded him from participation in or denied him the benefits of the entity's services, programs, or activities, or subjected him to discrimination, and (3) the public entity discriminated against him by reason of the disability." *Montgomery*, 2019 WL 3557369, at *8 (citing *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 267 (D.D.C. 2015)).

Where a plaintiff advances a claim of disparate treatment; where there is—as here—no direct evidence of discriminatory purpose; "and where the defendant denies that its decisions were motivated by the plaintiff's disability," courts in this circuit apply "the familiar burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Duncan v. WMATA*, 240 F.3d 1110, 1114 (D.C. Cir. 2001) (en banc). In the more common employment context, the *McDonnell Douglas* framework requires a plaintiff first to establish a prima facie case, which means he must allege that "[he] is part of a protected class under [the

relevant antidiscrimination statute], [he] suffered a cognizable adverse employment action, and the action gives rise to an inference of discrimination." *Walker v. Johnson*, 798 F.3d 1085, 1091 (D.C. Cir. 2015) (citing *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002)). Although "[t]he D.C. Circuit has never directly articulated the elements of a prima facie disparate treatment case in the special-education context," *A.M. v. Bridges Public Charter Sch.*, No. 17-177, 2019 WL 1932579, at *3 & n.8 (D.D.C. May 1, 2019), the same general structure applies.

The sufficiency of a plaintiff's prima facie case is typically assessed at the pleading stage because, by summary judgment, "the employer ordinarily will have asserted a legitimate, non-discriminatory reason for the challenged decision." *See Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). Once that legitimate, non-discriminatory reason has been asserted, "the question whether the employee has actually made out a prima facie case is 'no longer relevant' and thus 'disappears,'" *id.* (quotations omitted), leaving only the question whether the plaintiff has "produced sufficient evidence for a reasonable jury to find that the [defendant's] asserted non-discriminatory reason was not the actual reason and that the [defendant] intentionally discriminated against the [plaintiff] on the basis of" a protected characteristic, *id.* at 494.

A plaintiff asserting a reasonable accommodation claim under Title II instead must produce sufficient evidence "[1] that [he] was disabled for the purposes of the Rehabilitation Act, [2] that [the school had notice of [his] disability, and [3] that [the school] denied [his] request for a reasonable accommodation of [his] disability." *Chenari v. George Washington Univ.*, 847 F.3d 740, 746–47 (D.C. Cir. 2017) (quoting *Stewart v. St. Elizabeths Hosp.*, 589 F.3d 1305, 1307–08 (D.C. Cir. 2010)); *see also Am. Council of the Blind*, 525 F. 3d at 1260 n.2

(explaining that the Rehabilitation Act and Title II of the ADA "are similar in substance and consequently cases interpreting either are applicable and interchangeable").

Although not clearly spelled out in his complaint or his brief, it appears that Crockett premises his claim under Title II of the ADA—and thus his claim under the DCHRA—on both a theory of disparate treatment due to his disability and a theory of denial of reasonable accommodations. Defendants do not offer a legitimate, nondiscriminatory reason for their actions. They instead argue that, whatever Crockett's theory, he has failed to put forth *any* meaningful evidence of discrimination or a failure to accommodate, and, indeed, even though discovery has now closed, Crockett has yet to present any coherent picture of how his rights were purportedly infringed. Defendants are right that the absence of any evidence whatsoever would entitle them to summary judgment. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)). But Defendants must demonstrate, rather than merely assert, that dearth of evidence. Fed. R. Civ. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .")

To do so, Defendants point to Plaintiff's deposition, where he responded to questions about his claims by saying that he did not know the answers but would provide supplemental information on March 20, 2018. The following exchanges are typical of what occurred:

> Q. Let's start with your Claim 1, which is the violation of the Americans with Disabilities Act, and that starts on page 12. All right. Just a general question. Can you tell me what evidence you have to support the claims in your ADA claim?

> A.    In terms of evidence, I do not know.  But I can get you that on March 20th.

Dkt. 33-1 at 110–111 (Crockett Dep. Tr. 110:18–111:5).

> Q.    And looking at paragraph 80, who denied you access to support in your regular classes?
>
> A.    That I do not know off hand, but I can get you that information on March 20th.

Dkt. 33-1 at 112 (Crockett Dep. Tr. 112:1–5).

> Q.    Moving on to paragraph 81, what accommodations were you denied?
>
> A.    That I do not know off hand, but I can get you that information on March 20th.
>
> Q.    And can you tell me who denied the accommodations?
>
> A.    That information I can get you on March 20th.

Dkt. 33-1 at 112 (Crockett Dep. Tr. 112:14–20).

> Q.    Now if you look at paragraph 87, I found that very confusing . . . .  Can you explain to me the deal with obtaining power of attorney?  What was that all about?
>
> A.    I can explain and clarify that on March 20th.
>
> Q.    Okay.  And looking at paragraph 88, which is the final paragraph in this claim[.] . . . What additional work was required of you?
>
> A.    I can answer that in specifics on March 20th.

Dkt. 33-1 at 114–15 (Crockett Dep. Tr. 114:2–115:3).  Crockett failed to provide these

"specifics" on March 20 as promised.  *See* Dkt. 26 at 6; Dkt. 30 at 2–3.

According to Defendants, Crockett's ADA claim fails because he has offered no evidence

"that the alleged discriminatory actions taken by Defendants actually occurred," "let alone

provide[d] any evidence that the alleged actions were taken 'by reason of' his disability."  Dkt.

26 at 20.  That slightly overstates the paucity of evidence.  Nevertheless, the Court agrees with

the Defendant's conclusion.  Crockett has, for example, offered some evidence to support his

allegation that he was denied access to AP classes—specifically AP English. *See* Dkt. 33-1 at 85–87 (Crockett Dep. Tr. 85:6 – 87:18) (detailing how he was moved from AP English to Honors English, a lower-level class, because certain school officials thought that he "couldn't handle AP English"). But he has not offered any evidence to show, as he must, that he was "qualified" to be in that class. Dkt. 33-1 at 85–87 (Crockett Dep. Tr. 85:6–87:21) (testifying about his English class placement); *Duncan*, 240 F.3d at 1114; *see also Montgomery*, 2019 WL 3557369, at *8.

Similarly, if liberally construed, Crockett's complaint alleges that he was denied the following accommodations: (1) access to aides in "regular classes," Dkt. 1 at 13 (Compl. ¶ 80); (2) aid of a tutor in completing required assignments, *id.* (Compl. ¶ 84); (3) access to math tutoring classes during the lunch hour, *id.* (Compl. ¶ 79); (4) placement in a classroom that was not "below functioning level," *id.* (Compl. ¶ 82); and (4) "inclusion of all completed work upon due process determination hearing," *id.* (Compl. ¶ 83). He has failed, however, to offer sufficient evidence to permit a jury to find in his favor.

First, in his deposition, Plaintiff makes no mention of aides or other individualized in-class support—let alone that he was denied aides as a reasonable accommodation of his disability. *See* Dkt. 33-1. Second, when asked about his allegation that Njie refused to grade work that was completed with the assistance of a tutor, Plaintiff explained only that his grades went down over the course of the four terms that year, and he ultimately offered no testimony regarding the alleged refusal to grade any of his work because he had completed it with the help of a tutor. *Id.* at 90, 92 (Crockett Dep. Tr. 90:14–91:21, 92:14–21). Third, Crockett does assert that "the school failed to give [him] [his] ADHD compliant tutoring," *id.* at 14 (Crockett Dep. Tr. 14:8–10), and, more generally, that his "504 Plan" that "was developed in November of 2013"

was not "implemented until March" 2014, leaving him "in limbo as to whether [he] would" receive any § 504 accommodation during that period of time, *id.* at 37–39 (Crockett Dep. Tr. 37:11–39:1). But, when asked about these events at his deposition, Crockett testified that they related to his IDEA claim—and not his ADA claim:

> Q. And how does [the 504 Plan] relate to your ADA claim? It's not mentioned in in there at all?
>
> A. I'm going to go ahead and retract that statement then.
>
> Q. Okay.
>
> A. So mainly [the IDEA claim].
>
> Q. So you've looked, you've had an opportunity to look at your complaint and you're telling me that the only claim that the 504 Plans relate to is [your IDEA claim]?
>
> A. That and at this time we'll keep that [IDEA claim]. But I may change later.

*Id.* at 42 (Crockett Dep. at 42:2–42:13). Crockett did not correct this deposition testimony and has not sought otherwise to revisit this issue. Although parties proceeding *pro se* are entitled to some leeway, the opposing party is also entitled to some clarity regarding the nature of a *pro se* party's claims or defenses by the close of discovery.

Finally, Crockett alleges that the "DCPS discriminated against [him] by not allowing the inclusion of all completed work upon due process determination hearing." Dkt. 26 at 13 (Compl. ¶ 83). Although difficult to decipher, this allegation appears to refer to Njie's alleged failure to submit grades for Plaintiff's late-submitted homework. It is unclear whether Crockett means (1) that he was denied the benefit of a generally-applicable policy because of his disability, (2) that Njie denied him a reasonable accommodation for his ADHD, or (3) both. When asked about this allegation at his deposition, Crockett testified as follows:

> Q. [On] [p]age 4 of your complaint, Paragraph 25. There's a mention of a hearing officer's determination that was issued . . . . Do you remember what that complaint was about?
>
> A. That was about the, with Spanish 2 my teacher refused to accept my late assignment because it was after her supposed due date even though I had late time or extended time. And that resulted in me failing Spanish 2.

Dkt. 33-1 at 43 (Crockett Dep. Tr. 43:6–15).

> Q. Okay. And looking at Paragraph 115 where you say that the, which reads that the teacher added more work, did not count the work completed toward his grade and lowered his grade due to late submissions which were an accommodation of his IEP in retaliation, okay. Start from the beginning. What teacher are you talking about?
>
> A. That would be Ms. Njie.
>
> Q. And how do you know that work was not counted toward your grade?
>
> A. Because I would submit, well a little bit of background. I can see the submitted assignments on the system Edline which tracked all of our graded work. And I would know or I knew that I was submitting paperwork and I was submitting assignments and they weren't showing up in Edline. I questioned Ms. Njie as to why she hadn't graded them yet. She said she just hadn't graded them yet. And when I tried to get late assignments in at times she would refuse to accept those late assignments.
>
> Q. Do you know what specific assignments you tried to submit to her that were not graded?
>
> A. I couldn't tell you that in specifics right now. There are, I probably have over 200 assignments from that class alone my senior year. So[,] I'm going to need to look over some documents and see which ones were not graded.
>
> Q. And that's something that you're going to provide to me on March 20th?
>
> A. On the 20th.

*Id.* at 68–70 (Crockett Dep. Tr. 68:22–70:11). Crockett was also asked about the documents he produced to Defendants and whether they shed any light on Njie's alleged refusal to grade his homework. And there, too, he simply offered to provide additional information:

Q.      . . . I noticed in Groups 2, 3 and 4 [of the documents you sent] it[]
        mostly looks like course work.  But most of it is undated.  So it's hard
        to tell.  I don't know when they were, was this classwork, was this
        homework?

A.      Right.

Q.      Was this something that was graded or not graded?  It's just not clear
        what these, the purpose of these documents.

A.      Yes, those were classwork, homework assignments that, they're all from
        my senior year Spanish class with Ms. Njie.  I can probably by the 20th
        separate the graded versus non-graded assignments to give you guys
        better clarification on that.

*Id.* at 71 (Crockett Dep. Tr. 71:5–19).  Again, Crockett did not provide any additional material

by March 20th, as he promised.

Whether analyzed as a disparate treatment claim (under the prima facie case framework

or on the ultimate merits of the claim) or a reasonable accommodation claim, this testimony and

the documents that Crockett was asked about offer no more than a "mere scintilla" of evidence,

and, accordingly, do not suffice to preclude summary judgment.  *Liberty Lobby*, 477 U.S. at 252.

"[A]lthough, as a rule, statements made by the party opposing a motion for summary judgment

must be accepted as true for the purpose of ruling on that motion, some statements are so

conclusory as to come within an exception to that rule."  *Ass'n of Flight Attendants-CWA, AFL-*

*CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 466 (D.C. Cir. 2009) (quoting *Greene v. Dalton*, 164

F.3d 671, 675 (D.C. Cir. 1999)).  Here, Crockett has failed to offer any "supporting facts . . . to

assess his claim" that, by declining to grade Crockett's late-submitted assignments, Njie either

(1) discriminated against Crockett based on his disability or (2) failed to provide Crockett with a

reasonable accommodation to which he was entitled.  *Id.*; *see also Greene*, 164 F.3d at 675

(declining to accept as true at summary judgment plaintiff's conclusory statement in an affidavit

that she had applied for a job was not hired although "another student, who had less experience and education was hired").

Drawing all reasonable inferences in Crockett's favor, all that the evidence shows is that, at some point during his senior year, Njie did not grade some of his late assignments. The evidence does not reveal which assignments she failed to grade, how late Crockett was in completing those assignments, what policy, if any, applied to those assignments, what accommodation, if any, Crockett sought or received, how late Crockett was entitled to be under any such policy or accomodation, and whether Crockett would have passed Spanish if some identified assignment had been accepted based on some identified policy or accommodation. Vague assertions of the type Crockett offered at his deposition might be sufficient to survive a motion to dismiss; they are not, however, sufficient to fend off a motion for summary judgment. *See Greene*, 164 F.3d at 675 (observing that if a court were to accept conclusory allegations as true, without supporting facts, then "the central purpose of the summary judgment device, which is to weed out cases insufficiently meritorious to warrant the expense of a jury trial," would be defeated).

2.    *Retaliation*

Crockett also alleges that Defendants violated the ADA—and the DCHRA—by retaliating against him for his and his mother's prior disability-discrimination complaints against the DCPS. To state a prima facie case of retaliation under the ADA, a Plaintiff must allege that (1) he "engaged in protected activity;" (2) he "was subjected to adverse action by" the defendant; and (3) there is a causal connection "between the adverse action and the protected activity." *Mayers v. Laborers' Health & Safety Fund of N. Am.*, 478 F.3d 364, 369 (D.C. Cir. 2007), *abrogated on other grounds by Green v. Brennan*, 136 S. Ct. 1769 (2016). "[T]he elements of a

retaliate[ion] claim are the same under the DCHRA," moreover, "as under the federal employment discrimination laws." *Ingram v. D.C. Child and Family Serv. Agency*, 394 F. Supp. 3d 119, 124–25 (D.D.C. 2019) (quoting *Leftwich v. Gallaudet Univ.*, 378 F. Supp. 2d 81, 97 (D.D.C. 2012)).

Defendants do not, for purposes of their summary judgment motion, dispute that Plaintiff has engaged in protected activity or that intentionally failing a student constitutes an adverse action for present purposes. *See* Dkt. 26 at 22–23. Rather, they contend that "Plaintiff failed to provide the barest minimum of evidence to support his allegation." *Id.* at 22.

The Court agrees. When asked in his deposition, "How were you retaliated against," Crockett responded, "I cannot answer that at this time." Dkt. 33-1 at 68 (Crockett Dep. 68:1–2). When directed to the operative paragraph of his retaliation claim and asked "how [he was] retaliated against," Crockett responded, "I can get you that information on March 20th." *Id.* at 113 (Crockett Dep. 113: 15–18). When asked "[w]ho retaliated against" him," he answered, "[t]hat will also come on March 20th." *Id.* at 11 (Crockett Dep. 113:19–20). And, when asked "[w]hat harm was caused as a result of the retaliation," Crockett again took refuge in his promise to answer Defendants' questions by March 20th. *Id.* at 113–14 (Crockett Dep. 113:21–114:1). The same pattern applied to Crockett's answers to Defendants' remaining questions about his retaliation claim. With respect to each of the relevant allegations in the complaint, Crockett declined to provide any detail, support, or clarification, and merely promised to provide answers on March 20th. *Id.* at 114–15 (Crockett Dep. 114:2–115:6). And, again, March 20th came and went without the promised clarification. *See* Dkt. 26 at 6; Dkt. 30 at 2–3.

Although the burden at summary judgment on the non-moving party is "not a heavy one," he must nonetheless "show specific facts, as opposed to general allegations, that present a

genuine issue worthy of trial." Wright & Miller, Federal Practice & Procedure § 2727.2.
Crockett's testimony (and other evidence) regarding the alleged retaliation is not merely vague
or difficult to pin down; it is non-existent. Because Crockett has failed to offer any evidence that
would permit a reasonable jury to find Defendants retaliated against him because he (or his
mother) engaged in protected activity, Defendants are entitled to summary judgment on
Crockett's retaliation claim.

*   *   *

The Court will, accordingly, grant summary judgment in favor of Defendants on
Crockett's ADA and DCHRA claims (Counts I and XI).

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** Defendants' motion for summary
judgment, Dkt. 26, and will **GRANT** Defendant Shea's motion to dismiss with respect to
Plaintiff's defamation claim.

A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: April 10, 2020